IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

———————————

REY CORDOVA,

      Plaintiff,

v.                                            Civil No. 03-1372 WPJ/WDS

COUNTY OF BERNALILLO, et al.,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
**GRANTING SUMMARY JUDGMENT**

THIS MATTER comes before the Court upon Defendant's Motion for Summary Judgment, filed September 27, 2004 **(Doc. 43)**.  The complaint alleges that Defendant discriminated against Plaintiff on the basis of race, and retaliated against him, in violation of Title VII,  42 U.S.C.A.§ 2000e to 2000e-17.  (Counts I and II).   Plaintiff's state tort claim for damages from the Defendants for Gross Negligence and Intentional Infliction of Emotional Distress (Count III), was dismissed previously.  Doc. 23.   In his complaint, Plaintiff claims that he suffered psychological and physical injuries, as well as economic damages, as a result of the alleged discrimination and retaliation.  Having considered the parties' brief and applicable law, I find that summary judgment is appropriate for all of Plaintiff's claims.

**Background**

Plaintiff began his employment with Bernalillo County ("County") in 1993.  In 1998, Plaintiff became the became the Manager of the Youth and Senior Services Section ("YSS") of Bernalillo County's Parks and Recreation Department. Plaintiff's supervisor, Art De La Cruz, was

the Director of the Parks and Recreation Department.  Mr. De La Cruz' supervisor was Defendant Thaddeus Lucero, Director of the Community Services Division.  Defendant Lucero's supervisor was Defendant Juan Vigil, the County Manager, who answered directly to the Bernalillo County Commission ("Commission").  Defendant Tim Cummins is an elected member of the Commission.  Defendant Renetta Torres was the Director of Human Resources of Bernalillo County.

Viewed chronologically, Plaintiff's description of the events starts out with a letter of reprimand Plaintiff received on March 6, 2002 for failure to make timely bank deposits.  Jarrett Daniel Saavedra, who was employed in Plaintiff's department as a Recreation Coordinator, also received a reprimand.  Mr. Saavedra received a 10 day suspension, and Plaintiff was told an official reprimand would remain in his file for one year.  Plaintiff filed a grievance to this letter of reprimand.

In May 2002, Plaintiff received a phone call from Commissioner Tim Cummins "mandating" Plaintiff to hire Cummins' son, John to work at the summer program in the Parks and Recreation Department.  The Commissioner wanted his son to be placed in the Double Eagle Summer Program (located in Cummins' commission district), to be reclassified to recreation leader and receive a higher than normal entry-level salary.  Although not specifically stated in the complaint, it appears that Plaintiff acquiesced to the Commissioner's demands, and John was hired to work in the Double Eagle Summer Program.

Also on or around May 2002, Plaintiff fired Milton Thomas, who had been hired by the County Parks and Recreation Department as a contractor to help with a program sponsored by the Department.  Mr. Thomas was responsible for supervising contract employees and approving

their time cards.  Plaintiff alleges that in May 2002, Plaintiff discovered that Mr. Thomas paid contract employees for time not worked.  Plaintiff gave Mr. Thomas the choice of resigning or being fired.  Mr. Thomas resigned.

On May 24, 2002, Plaintiff attended a step two meeting with Defendant Lucero and Mr. De La Cruz, his immediate supervisor as part of the grievance procedure.  Some time in June, Defendant Lucero notified Plaintiff that the reprimand would be upheld.  However, the suspension against Mr. Saavedra, however, was overturned.   That same month, Plaintiff began to receive various complaints regarding a part-time summer staff employee working at the Double Eagle Summer Program, Cindy Hubbard-Rivera ("Rivera").   These complaints were reports that Ms. Rivera and John Cummins were "personally involved," which created an "uncomfortable work atmosphere."   Although not included in the complaint, Plaintiff states that Ms. Rivera was John Cummins supervisor at the Double Eagle program.  When Plaintiff confronted her, Ms. Rivera told Plaintiff, in Mr. Saavedra's presence, that she was also involved in an "intimate, personal relationship" with Commissioner Cummins.  Complaint, ¶ 28.  According to Plaintiff, Ms. Rivera did not make any attempts to hide her relationship with the Commissioner from other office staff. She indicated to Plaintiff that she wanted a promotion, and that she would inform the Commissioner if she did not receive one.  Plaintiff did not promote Ms. Rivera.

At some point during Plaintiff's employment, Suzanne Gutierrez (referred to by Plaintiff as "Suzanne Reese-Gutierrez") was hired as Assistant Manager of YSS.  Plaintiff describes Ms. Gutierrez as "an Anglo who was friends with Commissioner Tim Cummins."  Resp., at 20. Plaintiff was not asked for input into her selection for that position.  He remembers the position being open, and then being told by his supervisor, Art DeLaCruz, that Gutierrez had the job.

3

During July and August 2002, Plaintiff received phone calls from Commissioner Cummins regarding complaints about the Double Eagle Summer Program from parents, staff and school administration.  The Commissioner also made inquiries into the status of Ms. Rivera's promotion.  In late July 2002, Plaintiff requested and was granted family medical leave under the Family and Medical Leave Act (29 U.S.C. § 2601) due to his elderly father's illness.  The next discrete event occurs on September 10, 2002, when Plaintiff's home and possessions were searched pursuant to a search warrant that was executed by Bernalillo County sheriff's deputies.   Plaintiff alleges that while he was on FMLA leave, Defendants Cummins, Lucero, Vigil, and Torres pursued an investigation of Plaintiff's program and his official duties, at the Commissioner's directive.  Complaint, ¶¶ 34, 35, 36.  Plaintiff also alleges that the warrant was obtained with the "consent and knowledge" of those Defendants, and that the Commissioner used his political influence to have the Bernalillo County Sheriff's Department serve the warrant.  Complaint, ¶¶ 36-38.[1]

Plaintiff was placed on administrative leave on or around September 14, 2002.  At some point during this leave, Defendant Lucero informed Plaintiff that he could report back to work at the offices of the County Manager, also known as the "Tenth Floor," on November 4, 2002.[2]  However, on the morning of November 4, 2002, while Plaintiff was on his way to work at the County Manager's Office, he received a phone call from Defendant Lucero telling him not to

---

[1]  Plaintiff alleges that his sons and father were "treated very badly" by the individuals who searched the premises.  However, these assertions are not relevant to Plaintiff's own claim under Title VII.

[2]  The complaint uses the date "November 4, *2003*" (emphasis added).  However, this must be incorrect since Plaintiff submitted his resignation in February 2003.  Plaintiff was initially told he could return to work in late September, 2002, a fact which is not material to the outcome of any of Plaintiff's claims.

report to work at the County Manager's Office, but instead to report to work at the County Housing Department.  Upon reporting for work at the Housing Department, Plaintiff was given an empty desk with no office equipment.  He did not know what his job duties were until he was told to meet with an assistant at that office,  Plaintiff was instructed on his duties, which entailed visiting houses and doing inspections.  On February 7, 2003, Plaintiff resigned from his employment with Bernalillo County.

According to Defendants' version, Plaintiff was neither targeted nor singled out impermissibly.   Search warrants were executed not only at Plaintiff's residence, but also at various YSS sites, in order to investigate possible fraud occurring in the YSS.   Allegations of fraud started when John Cummins told his father, the Commissioner, that there was a serious shortage of arts and crafts supplies, and cleaning supplies, at the Double Eagle Elementary School ("DEES").  The Commissioner asked Defendant Lucero to inquire into the reason for these shortages.  Around this time, Ms. Rivera informed told Defendant Cummins that a former YSS employee had told her that various YSS employees were engaged in a scheme to defraud the County through the use of phony contracts for services.  At a meeting with the Commissioner, she told the Commissioner that the former employee was Milton Thomas, who was willing to discuss the matter with the Commissioner.

In July, 2002 Defendant Cummins met with Mr. Thomas and Renetta Torres.  At this meeting, Mr. Thomas stated that several YSS employees had a scheme by which they would approve phony contracts for the provision of services in various YSS programs and then keep the money for themselves.  Mr. Thomas implicated himself, Jerret Saavedra and the Plaintiff in the scheme.  A police report was filed with the Bernalillo County Sheriff's Department, and search

warrants were executed by Bernalillo County sheriffs.   There were reports in the media

concerning the allegations in the affidavit in support of the search warrant, and the execution of

the search warrants.

## Discussion

Title VII applies only to employers.  Lankford v. City of Hobart, 27 F.3d 477 (10th Cir.

1994)(citing Sauers v. Salt Lake County, 1 F.3d 1122, 1127 (10th Cir. 1993)).  A person qualifies

as an employer under Title VII if he or she serves in a supervisory position and exercises

significant control over plaintiff's hiring, firing or conditions of employment.  Sauers, 1 F.3d at

1125. Supervisory employees thereby become alter egos of the employer.  Id.  Plaintiff is suing

Defendants Lucero, Vigil and Torres in their official capacities only, but Defendant Cummins in

both his "personal" (or individual) and official capacities.  Complaint, ¶¶ 7-10.  Title VII claims

against Defendant Cummins in his personal capacity will be dismissed because personal capacity

suits against individual supervisors are inappropriate under Title VII..  Haynes et al v. Williams et

al, 88 F.3d 898, 901 (10th Cir. 1996), cited in Butler v. City of Prairie City, Kan., 172 F.3d 736,

743 (10th Cir. 1999).[3]

Plaintiff bases his claims of discrimination on numerous discrete actions allegedly taken by

Defendants because he is Hispanic:

   "        Plaintiff received a letter of reprimand;
   "        Plaintiff received telephone calls and complaints from Defendant Cummins
            concerning the DEES Summer Program;
   "        Plaintiff was required to hire Suzanne Gutierrez as Assistant Manager of YSS;
   "        Plaintiff received a phone call from Defendant Cummins sometime in the spring of
            2002 in which Defendant Cummins stated that he wanted his son, John, to work at

------

[3] The Court's use of the word "Defendants" thus refers in general to Plaintiff's employer,
rather than to the individual Defendants collectively.

the YSS summer program at the DEES and for his son to receive pay at a rate higher than normal pay for an entry-level position;

" Plaintiff received a phone call from Defendant Cummins in which he asked about the status of Cindy Rivera and the reason that Ms. Rivera was not given a promotion;

" Plaintiff was accused of doing something wrong which resulted in the Sheriff's Department's investigation and the execution of the search warrant on the Plaintiff's residence;

" There were reports in the media about the case;

" After being placed on paid administrative leave, he ended up being assigned to the Housing Department instead of the Tenth Floor.

Plaintiff's claims, without exception, suffer a fatal defect. The motif running throughout Plaintiff's allegations and Plaintiff's testimony is that Commissioner Cummins orchestrated, directed or encouraged actions taken against Plaintiff essentially because Plaintiff refused to promote an individual who was allegedly personally involved with the Commissioner, rather than for any racially or ethnically motivated reasons. Plaintiff is at times his own worst enemy, stating that actions allegedly described as discriminatory were carried out for reasons that were legitimate and nondiscriminatory. See, e.g., Pltff's Resp. to Defts' Undisp. Facts No. 5 (". . . This is disparate treatment, rising to the level of discrimination and retaliation against Mr. Cordova, because he failed to promote Hubbard-Rivera, Cummins' friend, with whom he had a personal relationship. . . ."). Along the same vein, Plaintiff does not offer any evidence which might raise a dispute of material facts, but instead presents a clutter of details which are either unresponsive, irrelevant to the subject matter being addressed or which constitutes legal argument. Under Count I, Plaintiff's complaint does not specify what conduct he alleges constitute discrimination, see, Complaint, ¶ 58 ("Plaintiff was subjected to adverse treatment due to his racial origin contrary to the provisions of Title VII,") although he does describe various conduct as retaliatory in Count II. The Court first addresses Plaintiff's claims in Count I, casting a broad net over

Defendants' conduct that comes within the purview of Plaintiff's factual allegations of discrimination.

**Legal Standard**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  I construe the record in the light most favorable to the non-moving party.  Reed v. McKune, 298 F.3d 946, 949 (10th Cir. 2002).

**I.     Discrimination under Title VII - Count I**

When, as here, a plaintiff relies on circumstantial evidence to demonstrate employment discrimination, the Court applies a three-step burden-shifting framework set forth in McDonnell Douglas and its progeny, applicable to both Plaintiff's discrimination and retaliation claims. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-07 (1973); Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1212 (10th Cir. 2003). McDonnell Douglas first requires Plaintiff to establish a prima facie case of prohibited employment action, a burden which is "not onerous." McCowan v. All Star Maint., Inc., 273 F.3d 917, 922 (10th Cir. 2001) (internal quotation marks omitted).  Once Plaintiff makes a prima facie showing, the burden shifts to Defendants to state a legitimate, "nondiscriminatory reason" for its "adverse employment action." Wells, 325 F.3d at 1212.  If Defendants meet this burden, then summary judgment is warranted unless Plaintiff can show that there is a genuine issue of material fact as to whether the proffered reasons are pretextual. Jones v. Denver Post Corp., 203 F.3d 748, 756 (10th Cir. 2000).  Pretext can be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319,1323 (10th Cir. 1997) (citations omitted).

Except for Plaintiff's claims of constructive discharge, Plaintiff's claims are not based on discriminatory discharge or termination.  For general claims of discrimination under Title VII, a plaintiff makes out a prima facie case upon showing: (1) that plaintiff belongs to a protected class; (2) that he suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Jones, 203 F.3d at 753 (10th Cir.2000); Hysten v. Burlington Northern & Santa Fe Railway Co., 296 F.3d 1177, 1180 (10th Cir. 2002) (noting that ordinarily the third prong is satisfied by proof that the employer treated similarly situated employees more favorably, but that "courts must be sensitive to the myriad of ways such an inference can be created").

Parties do not dispute that Plaintiff is a member of a protected group.  What is disputed is whether, based on any of the allegations of discrimination, Plaintiff suffered an adverse employment action, or whether Plaintiff can show evidence of pretext in actions taken by Defendants.  The Tenth Circuit has continued to liberally define the term "adverse employment action," taking on a case-by-case approach.  Hillig v. Rumsfeld, 381 F.3d 1028 (10th Cir. 2004) (citations omitted).  An "adverse employment action" does not encompass every action taken by a plaintiff's employer that may affect the plaintiff's future employment opportunities, nor does it include those acts that merely have a *de minimis* impact upon an employee's future job opportunities.  Aquilino v. Univ. of Kan., 268 F.3d 930, 934-35 (10th Cir. 2001).  The

employer's conduct must be "materially adverse" to the employee's job status.  Hillig, 381 F.3d

1028 (citing Wells v. Colorado Dept. of Transportation, 325 F.3d 1205, 1213 (10th Cir. 2003)).

Most of Plaintiff's allegedly discriminatory actions are not adverse.  However, because

Plaintiff's burden in meeting a prima facie case is not onerous, see, McCowan v. All Star Maint.,

Inc., 273 F.3d 917, 922 (10th Cir. 2001), the Court's analysis will proceed in each scenario on the

assumption that Plaintiff has met this burden.

A.    Disparate Discipline

Plaintiff claims that he was singled out when, on March 26, 2002, he received a letter of

reprimand from Mr. DeLaCruz for failing to ensure that deposits of money collected at YSS sites

was deposited within twenty-four hours of receipt of the money, as required by New Mexico law.

Defendants first argue that this claim is barred for lack of administrative exhaustion.  See,

Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996) ("Exhaustion of administrative remedies is

a 'jurisdictional prerequisite' to suit under Title VII").  Defendants are correct.  Plaintiff's EEOC

complaint was filed on or after February 7, 2003.[4]  The charge of discrimination describes acts

relating to incidents leading up to the execution of the search warrants, being placed on leave,

reassignment to another position, retaliation for "opposing discriminatory hirings and requested

promotions" and a hostile work environment.  Nowhere in the charge does Plaintiff mention the

reprimand, which he received more than 300 days prior to filing the EEOC charge. Mascheroni v.

Bd. of Regents of the Univ. of Cal., 28 F.3d 1554, 1557 (10th Cir. 1994) (Since New Mexico is a

deferral state, plaintiff must show that the allegedly discriminatory actions occurred within 300

---

[4]  Exhibit A contains an attached copy of the charge of discrimination, which does not
include the date it was filed.  However, it stands to reason that the "date the discrimination took
place" is alleged to be February 7, 2003, Plaintiff could not have filed it before that date.

days of the date on which he filed EEOC charge).  Plaintiff's claim of a "continuing violation" does not eliminate the exhaustion barrier. The Tenth Circuit has recently eliminated the continuing violation doctrine for discrete discriminatory acts, even if those acts are sufficiently related to those acts occurring within the limitations period.   Davidson v. AOL, Inc., 337 F.3d 1179, 1185 (10th Cir. 2003) (relying on Nat'l RR Passenger Corp. v. Morgan, 536 U.S. 101 (2002)).  Each discrete act of alleged discrimination must be separately exhausted within the statutory time period.  Morgan, 536 U.S. 101.

I reject Defendants' contention, however, that the Court consider as exhausted only Plaintiff's claims of discrimination which occurred exactly on February 7, 2003, because that is the date given on Plaintiff's EEOC charge as the date on which the alleged discrimination occurred.  Ex. A, (Ex. A attachment).[5]  I find this view somewhat constrictive, since within the text of the charge form, Plaintiff clearly asserts claims of discrimination and retaliation which occurred prior to that date and within the prescribed limitations period.  However, even if Plaintiff had exhausted the claim regarding disparate discipline, it would ultimately fail on the merits.

1.    Prima Facie Case

The Tenth Circuit has stated no general rule regarding letters of reprimand, particularly where the reprimand was without negative consequences.  Dunlap v. Kan. Dept. of Health & Env't, 211 F.Supp.2d 1334, 1343 (D.Kan.2002); but see, Roberts v. Roadway Express, 149 F.3d 1098, 1103 (10th Cir. 1998) (Written warnings issued to employee were "adverse employment actions," required for prima facie case of retaliation under Title VII; the more warnings an employee received, the more likely he or she was to be terminated for a further infraction).  There

_____

[5] Exhibits will be referenced solely by number (Plaintiff's) or letter (Defendants').

is no need here to determine whether Plaintiff was likely to have suffered negative consequence from the issuance of the letter of reprimand, since I will assume that the letter constitutes an adverse action sufficient to meet the benign requirements of a prima facie case.

2.      Shifting Burden and Pretext

In order to prevail against Defendants' summary judgment motion, Plaintiff must present some evidence which suggests that the real reason he was issued a letter of reprimand was not because of the reasons offered by Defendants, but because Plaintiff is Hispanic.  In the context of disparate discipline cases due to race or ethnic origin, Plaintiff must show that he was treated differently than other similarly situated non-minority employees who violated the same rule or committed infractions of equal seriousness.  Elmore v. Capstan, Inc., 58 F.3d 525, 529 (10th Cir. 1995).  Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.  Aramburu v. Boeing Co., 112 F.3d 1398, 104 (10th Cir.1997).

Defendants describe the situation as a "County-wide" problem and one where Plaintiff was not singled out for discipline.  Following an August 2001 audit, Mr. De La Cruz held a staff meeting with other managers as well as Plaintiff, providing them with a copy of the audit findings and with instructions to ensure that deposits are made within twenty-four hours.  Four months later, one of Plaintiff's subordinates approached Corina Ali, the Budget and Planning Officer, notifying her that he had several deposits that were untimely, and that he was having problems making the deposits with the County Treasurer's office.  When Ms. Ali brought the matter to Mr. De La Cruz' attention, it became apparent that the YSS section, which Plaintiff managed, had a problem with complying with the timely deposit requirement that was "more pervasive" than any

of the other divisions, and that it had not improved since the staff meeting.  Ex. M.

Plaintiff's claim of disparate treatment is based solely on his assertion that Jarret Saavedra's reprimand, which resulted from the same audit, was eventually overturned, and that there was no adverse action taken against him.  Plaintiff is unable to meet his prima facie case in this claim.  First, there is no dispute about the fact that Saavedra himself is Hispanic.  Second, Plaintiff offers no information about Saavedra's conduct with regard to untimely deposits.  Thus, even if Saavedra violated the same mandate concerning timely bank deposits, there is no way to know whether Saavedra did so with equal seriousness.  Without this information, the fact that Saavedra's five-day suspension was ultimately overturned can not form the basis for a disparate discipline claim.

Furthermore, this claim can not withstand Defendants' motion because Plaintiff has not presented any evidence which would support a presumption of disparate discipline.  See, EEOC v. Horizon/CMS Healthcare, Corp., 220 F.3d 1184, 1195 n. 7 (10th Cir. 2000) (warning that to avoid "short-circuit[ing]" a plaintiff at the prima facie stage, the better approach is to first ask if the plaintiff was treated differently than non-protected individuals, then permit the plaintiff to show pretext).      Plaintiff's own statements defeat his claim.  Plaintiff describes the reprimand as discriminatory and retaliatory conduct on the part of the "commission" simply because Defendant Lucero, who was Mr. De La Cruz' supervisor, signed off on the reprimand.  Yet Plaintiff admits he offers nothing but his own speculation to connect any of the Defendants with a discriminatory motive.  Ex. A, 196:1-9, and:

    Q.    Are you saying that Mr. Lucero was treating you differently on account of the fact
          that you're Hispanic?
    A.    No.

13

Ex. A, 195:12-15.  Plaintiff himself advances the non-discriminatory motif mentioned earlier, in referring to "issues" that he had with Commissioner Cummins, Cindy Rivera and Suzanne Gutierrez as the reasons he was having a "hard time" with the Anglos.  Plaintiff cannot build a discrimination claim solely on the fact that Defendants are Anglo, or on the fact -- even if true -- that the Commissioner resented Plaintiff because he would not promote Cindy Rivera.  Thus, this claim fails because Plaintiff has not offered evidence to dispute Defendants' material facts or to rebut Defendants' legitimate reasons for issuing the reprimand letter.  It also fails because Plaintiff himself has advanced a reason for Defendant's actions which, even if true, would entitle Defendants to summary judgment on the claim.  See, e.g., Randle v. City of Aurora, 69 F.3d 441, 451 n.14 (10th Cir. 1995) (when true reason for employment decision is not a prohibited discriminatory reason, even if concealed, defendant is entitled to summary judgment although it was pretextual).

Plaintiff makes much of his complaining to Mr. De La Cruz that he felt "singled out" by the reprimand.  Mr. De La Cruz remembers Plaintiff's complaints regarding the reprimand, but stated that Plaintiff never mentioned his race or ethnicity as the basis for the belief that he was being treated differently.  Ex. 3, 63:25 - 64:1-5.  In his grievance letter, Plaintiff expressed simply that "Youth and Senior Services section was singled out when in fact it was a departmental issue . . ." The letter is devoid of any reference to discrimination on the basis of race or ethnicity. Ex. 19. Plaintiff offers testimony from Jennifer Chavez and Diane Valdez, who testified that Plaintiff was "singled out."  These statements are insufficient to create an issue of fact for pretextual motive for two reasons.  The statements are based merely on these witnesses' assumptions. Ex. 8, 70:1-4; Ex. 9, 22:1-10, 17-20.  Second, they reflect only what they were told by Plaintiff.  Neither

individual witnessed any acts from which discrimination can be inferred.  Ex. 8, 71:14-18; Ex. 9, 22:10-14.   Since Plaintiff's own subjective belief of discrimination is not sufficient to preclude summary judgment, see Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1491 (10th Cir.1995), Defendants are entitled to summary judgment on Plaintiff's claims of disparate discipline.

B.      Complaints and Phone Calls

        Plaintiff claims that in July and August of 2002, he received complaints and about two or three phone calls from Defendant Cummins about problems he was hearing about the DEES site. Ex. A, 98:8-10.  The Commissioner also asked Defendant Lucero to look into whether there was a lack of supplies at the program. These calls and complaints, taken either singly or together, do not constitute an adverse employment action without evidence that these actions had some impact on Plaintiff's employment status.  See,  Sanchez v. Denver Public Schools,164 F.3d 527 (10th Cir. 1998) (unsubstantiated oral reprimands or unnecessary derogatory comments not adverse employment action without evidence these had some impact on employee's employment status). Plaintiff alleges no such impact, nor does the Court find any.

        Plaintiff wastes useless argument on whether or not supplies at the program were in fact running short.  This has no bearing on the claim, since even if Plaintiff was able to meet his prima facie burden, he does not present any evidence toward his ultimate burden -- a showing that Defendant Cummins made these phone calls and complaints out of a discriminatory motive.

C.      Hiring of Suzanne Gutierrez and John Cummins

        Plaintiff claims that he was required to hire two individuals, Suzanne Gutierrez (as his assistant) and John Cummins.  He also asserts that Defendant Cummins stated that he wanted his son John, to receive pay at a rate higher than normal pay for an entry-level position.  For this

claim, Plaintiff basically contends that being forced to hire Anglos discriminates against him because he is Hispanic. Plaintiff does not allege that he lost his job to Suzanne Gutierrez or John Cummins, or that the terms of his employment or future employment prospect were affected in any way by the hiring of either Ms. Gutierrez or John Cummins. Thus, it is not clear how Defendants' actions -- either in giving Ms. Gutierrez her position as Plaintiff's assistant or in Commissioner Cummins wanting his son to work at YSS -- constitute adverse employment actions, even as that term is broadly defined by this Circuit. Even accepting Plaintiff's factual version as true, Plaintiff suffered no more than minor inconvenience.

Regardless of whether Plaintiff has met his prima facie case, Plaintiff does not present any circumstances underlying the hiring of either individual which give rise to an inference of discrimination. There is no evidence that the Commissioner's calls to Plaintiff regarding his son's position and salary at YSS were made with a discriminatory motive. Also, the chronology of events regarding Ms. Gutierrez' hiring as assistant manager works against Plaintiff's contentions that Commissioner Cummins had any role in her selection. It is undisputed that Defendant Cummins did not take office on the Bernalillo County Commission until January 1, 2001, over a year *after* Ms. Gutierrez was given the position as Plaintiff's assistant. Defendants are entitled to summary judgment on this claim as well.

D.    <u>Cindy Rivera's promotion</u>

Plaintiff claims that Commissioner Cummins contacted him to find out why Cindy Rivera did not get a promotion. According to Plaintiff, Ms. Rivera was involved in personal relationships with both Commissioner Cummins and his son, whom she left work with everyday. Plaintiff claims he heard Ms. Rivera brag about having an intimate relationship with the Commissioner in

16

the presence of office staff, and that she had stayed over at the Commissioner's house.  Ex. 1:
210-11.  In her deposition, however, Ms. Rivera vehemently denied having had personal
relationships with either Commissioner Cummins or John Cummins.  Ex. 10: 47, 63.  She also
stated that she had been to Commissioner Cummins' house only one time, for about an hour, in
his backyard, during which time she told the Commissioner about the information she received
from Milton Thomas regarding improper county contracts.

Viewing the facts favorably to Plaintiff, as I must, I cannot conclude that the
Commissioner's inquiries regarding Ms. Rivera's job status resulted in an adverse employment
action.  Plaintiff's own terms of employment were not in the least degree affected, whether or not
Ms. Rivera would have been successful in getting the promotion.  These inquiries fall into the
same category as the Commissioner's phone calls regarding supply shortages at the YSS program.
Moreover, even accepting as true all of Plaintiff's allegations concerning Ms. Rivera's
relationships with Commissioner Cummins and John Cummins, Plaintiff fails to show how the
Commissioner's interest in Ms. Rivera, or his inquiries about her promotion, are illegal motives,
because they are based on a "voluntary romantic affiliation" rather than on any racial or ethnic
differences.  Taken et al v. Okla Corp Comm., 125 F.3d 1366, 1370 (10th Cir. 1997) (Favoritism,
unfair treatment and unwise business decisions do not violate Title VII unless based on a
prohibited classification); Sanchez v. Philip Morris, Inc., 992 F.2d 244, 247-48 (10th Cir.1993)
(stating that Title VII does not protect against adverse employment decisions made on such
factors as favoritism or mistake).  Summary judgment will be entered for Defendants on this
claim.

E.     Fraud Investigation

Plaintiff claims that the filing of the criminal complaint, and the issuance and execution of the search warrant were discriminatory actions.  Plaintiff further contends that Commissioner Cummins initiated the meeting with Cindy Rivera, and proceeded to direct or control subsequent events, including the execution of the warrants and the search of Plaintiff's house.  Plaintiff also contends that he continues to be harassed in that members of the Sheriff's Department continue to make inquiries about Plaintiff's character and finances.

1.     Prima Facie Case

Filing a false criminal complaint can be an adverse employment action, since it can result in a "significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects."  Berry v. Stevinson Chevrolet, 74 F.3d 980, 987 (10th Cir. 1996), but see, Aviles v. Cornell Forge Co., 241 F.3d 589, 594 (7th Cir. 2001) (no Title VII liability for the filing of a truthful police report, where there is no evidence that employer singled out a particular ethnic group for its report to the police).  Plaintiff alleges that he was wrongfully accused of criminal acts.  Taking this allegation as true on its face, I find that Plaintiff has satisfied a prima facie case of disparate treatment.

2.     Shifting Burden and Pretext

Defendants offer a set of facts which easily satisfies their burden of persuasion.  While Commissioner Cummins did set up a meeting with Cindy Rivera, he did so at the request of Milton Thomas, after Ms. Rivera informed the Commissioner about the scheme to defraud the County.  Ex. 10, 44:16-22, Ex. L, 43:12-25.  At this point, the Commissioner was under a duty to report the crime to the authorities, not because Plaintiff was Hispanic but because he had

knowledge that a crime had been reported which involved theft of money from the County.  The Sheriff's Department obtained and then executed warrants to search Plaintiff's home, as well as other individuals who were allegedly involved in the fraud scheme.  These factual assertions constitute legitimate, nondiscriminatory reasons for the filing of the criminal report against Plaintiff and the execution of the search warrant and are sufficient to shift the burden of proof back to Plaintiff.

In order to show pretext, Plaintiff must provide evidence which would suggest weaknesses or inconsistencies in Defendants' presented reasons for their actions.  Plaintiff offers nothing to rebut Defendants' legitimate reasons.  He does not dispute that Defendant Cummins arranged the meeting after receiving information about fraud being committed on the County, or that Defendant Cummins called the County Sheriff's Department.  Instead, he makes much of the fact that the Commissioner contacted the County Sheriff's Department rather than the Albuquerque Police Department.  Aside from the fact that it makes perfect sense to call the authorities who have ostensible jurisdiction over a matter,[6] I am at a total loss to see how contacting the Sheriff's Department rather than the city's police department indicates or implies improper motive on the part of Defendants.

Plaintiff's position is premised entirely on his contention that the allegations regarding his involvement with the fraud scheme were false.  Plaintiff thus appears to misunderstand the nature of the burden he constantly carries on this claim, as well as his other claims.  In the context of Plaintiff's discrimination claim, it does not matter whether the allegations of fraud were in fact

---

[6] The undisputed facts are that Plaintiff was employed by the *County*, and that the scheme was to defraud the *County*.

false, but whether any of the actions taken by Commissioner Cummins or the other Defendants were carried out with a discriminatory motive based on Plaintiff's ethnic origin.  The real question is whether Commissioner Cummins had a "good faith belief" in filing the criminal complaint, even if those allegations of fraud proved to be false in the end.  Pretext cannot coexist with an employer's good faith belief.  See, McKnight v. Kimberly Clark Corp. et al, 149 F.3d 1125 (10th Cir. 1998).  In McKnight, the plaintiff had been accused of sexual harassment and was terminated.  Plaintiff then sued his employer for age discrimination, alleging that the "victim" was not telling the truth about the harassment.  Plaintiff's claim in that case failed because the employer's actions resulted from a good faith belief in the "victim's" story, even if it turned out to be false.

Plaintiff's claim in this case fails as well, because Plaintiff does not offer any evidence from which pretext can be inferred.  See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 529 (10th Cir. 1994) (retaliation claim).  Plaintiff does not dispute that at the July 2002 meeting between the Commissioner, Milton Thomas and Renetta Torres, Mr. Thomas named him as one of the individuals involved in the fraud scheme.  He does not dispute that Mr. Thomas implicated himself as well as the Plaintiff, Jarrett Saavedra, and other individuals in the scheme to defraud the County.  This information easily establishes the basis for Commissioner Cummins' good faith belief that Plaintiff had committed a crime, which would then lead to his forwarding the complaint to the proper law enforcement authorities.

Plaintiff attempts to show pretext by raising other "facts": that a search warrant was not executed on Milton Thomas' home, even though Mr. Thomas admitted to the crime; that Plaintiff has not been charged with a crime; and that there was a delay of three days between the execution of the search warrant and the placement of Plaintiff on paid administrative leave.  These attempts

are unsuccessful.  Plaintiff's statement of "fact" that a search warrant was not executed on Milton

Thomas' home is an unsupported allegation, and turns out to be false.  Defendants present a copy

of a warrant that was executed on Mr. Thomas' home, which Plaintiff does not challenge.  See,

Ex. T.  The fact that Plaintiff has not been charged with a crime is immaterial.  As noted earlier,

whether Plaintiff actually committed the crime is not relevant to the discrimination issue.[7]  With

regard to the three day delay between the execution of the search warrant and his placement on

administrative leave with pay, Defendants present evidence that the delay occurred because

Defendants Vigil (the County Manager) and Defendant Lucero (Deputy County Manager) were

out-of-state attending a conference and not present to deal with the situation.  During the three

day period, John Dantis (acting County Manager during Vigil's absence) contacted Mr. Vigil to

determine the appropriate action; and the decision was made to place Plaintiff on paid

administrative leave pending the outcome of the investigation.  Ex. Q, ¶ 5.  Not only does Plaintiff

fail to show how the delay was pretextual, he himself states that the delay "wasn't really

discriminatory. . . that was just gross negligence."  Ex. N, 278:5-11.

　　　　Plaintiff also attempts to raise inferences of pretext through Mr. De La Cruz' statement

that he had never seen raids conducted by the police in his 25 years of County service.  In its full

context, however, the statement is insufficient to raise any such inference.  Mr. De La Cruz

actually responded to the question whether Plaintiff was treated differently from any other

employee by stating that he was "not sure how to answer that. . . ."  Ex. 3, 62:1-11.  Mr. De La

---

　　　　[7]  Mr. Saavedra was indicted by the Bernalillo County Grand Jury on a variety of felony
charges stemming from a scheme to defraud the County by using fraudulent contracts, and later
confessed to the crimes.  Ex. I, 48:12-24.  Also, Defendants point out that the statute of
limitations for such crimes has not yet run out with regard to Plaintiff.

Cruz admitted that he had never personally witnessed Plaintiff being treated differently on account of his race or ethnicity, a defect which renders Mr. De La Cruz' statement ineffective for purposes of summary judgment. Tavery v. U.S., 32 F.3d 1423, 1426 n.4 (10th Cir. 1994) (under Fed.R.Civ.P. 56(e), only statements made on personal knowledge will support a motion for summary judgment (citing Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 831, (1950)). Mr. De La Cruz also stated that Plaintiff had complained about being treated differently with regard to the disciplinary action taken against him, but added that Plaintiff never mentioned race or ethnicity as the basis for his belief that he was being treated differently.

Plaintiff provides no factual basis for his bare assertion that Commissioner Cummins directed or controlled the investigation by the Sheriff's Department. This assertion begins with the sole fact that the County Commission controls the Sheriff Department's budget, and jumps to the unsupported conclusion that people "who benefit from said budget will do what is asked or expected of them," lacking any sort of circumstantial evidence in between. See, Ex. 2, at 15:4-6. Pretext for discrimination cannot be inferred from the mere fact that the Sheriff's Department is an "internal agency" of the County. Ex. 11, 57:1-7. Defendants presents ample evidence that other than reporting the fraud to the authorities, they had no other personal involvement with the investigation, including no knowledge that the search warrants existed prior to their execution on Plaintiff's home and YSS offices. Exs. B, C, E, G (Affidavits of Torres, Cummins, Vigil, Lucero). Plaintiff has no personal knowledge, nor does he offer the testimony of others, which would discount Defendants' evidence and create a reasonable inference that the investigation was controlled or directed by any of the Defendants.

Plaintiff states, and Defendants concede, that Commissioner Cummins spoke with a

detective (or sheriff's deputy, according to Plaintiff) after the criminal complaint was filed.

Defendant Cummins testified that one of the detectives investigating the matter interviewed him at

a meeting that lasted about half an hour.  Ex. L, 63:5-20.  This is not proof which creates a

dispute of fact regarding whether the Commissioner was directing or controlling the investigation.

Thus, while Plaintiff's factual assertion is undisputed, the conclusion advanced by Plaintiff is

supported only by Plaintiff's speculation.

Plaintiff claims that discrimination can be inferred by Defendants' failure to use County

procedures relating to investigating complaints of "inappropriate conduct" such as "abuse of

property, thefts, lying discrimination or harassment . . . ."  Ex. 14.  A scheme to defraud the

County would undoubtedly constitute a "theft."   While the County could have proceeded with its

own internal investigation into the matter, there is nothing in the language of the policy which is

inconsistent with the County also reporting the matter to law enforcement authorities.  Defendant

Vigil, who was County Manager, stated that the County commonly referred allegations of

criminal wrongdoing by County employees to law enforcement authorities and awaited "the

results of the criminal investigation prior to the institution of an internal investigation of taking

disciplinary action against that employee."  Ex. Q, ¶ 3.   In Plaintiff's case, the decision was made

to refrain from conducting an internal investigation into allegations against Plaintiff until the

Sheriff's Department concluded its investigation.  Ex. Q, ¶ 4.  The decision was also made to

place Plaintiff on leave with pay, and then have him return to work at a position unrelated to his

job duties at YSS (in light of the ongoing criminal investigation).

Plaintiff contends that Defendants had other alternatives to the decision made by

Commissioner Cummins to forward the matter to the Sheriff's Department.  The existence of

23

other alternatives does not lead to the conclusion that Defendants' actions were discriminatory. As discussed earlier, all evidence supports the finding that Defendant Cummins had an unassailable "good faith belief" that Plaintiff was involved in the scheme, regardless of whether he exercised proper judgment at the time. See, Reynolds v. Sch.Distr.No. 1 Denver, 69 F.3d 1523, 1535 (10th Cir. 1995) (articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment; the test is good faith belief).

Plaintiff does not explain how the decision to wait for the Sheriff's Department to complete its investigation before initiating its own internal investigation is evidence of pretext. Nor does he offer evidence which shows any weakness or implausibility in Defendants' legitimate reasons for their conduct in responding to accusations that Plaintiff was involved in a scheme to defraud the County. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000) (prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability).     For the above stated reasons, I find that Defendants are entitled to summary judgment with regard to Plaintiff's claims of discrimination based on filing of the criminal complaint, and the issuance and execution of the search warrant.

F.     Employment at Housing Office

Plaintiff characterizes his placement in the Housing Office instead of the Tenth Floor at the County Manager's building as examples of discriminatory acts by Defendants.

1.     Prima Facie Case

In some instances, a transfer can be considered an adverse action where it has a demonstrable adverse impact on future employment opportunities or performances, such as

24

"termination, demotions, adverse or unjustified evaluations and reports, transfer or reassignment of duties and failure to promote." Lee v. N.M. Bd. of Regents, 102 F.Supp.2d 1265, 1275 (D.N.M. 2000).  However, an involuntary lateral transfer, without more, does not constitute an "adverse employment action."  See, e.g., Sanchez v. Denver Public Schools, 164 F.3d 527,532 (10th Cir. 1998) (lateral transfer not adverse where plaintiff's salary, benefits and teaching responsibilities were not altered, where transfer merely increased the employee's commute and where the transfer was prompted by decreasing student enrollment).

I view the transfer from Plaintiff's original position as manager of the YSS section, and not as a transfer from the Tenth Floor to the Housing Department, as Defendants urge.  Plaintiff never assumed job duties at the Tenth Floor.  Plaintiff suffered no loss of pay or benefits in his duties at the Housing Department.  Being without a desk or office supplies for a few days (Ex. J at 398) is not an adverse employment action, as these minor inconveniences can hardly be said to have any impact on Plaintiff's future job opportunities.  Aquilino v. Univ. of Kan., 268 F.3d 930, 934 (10th Cir. 2001) (excluding from definition of adverse employment action those acts that merely have a *de minimis* impact upon an employee's future job opportunities).

What is not clear is whether Plaintiff's new position, which involved doing housing inspections, was tantamount to a demotion.  Plaintiff worked only for a short time at the Housing Department before resigning.   Plaintiff stated in his deposition that he worked at the Housing Department at least two months, and showed up for work every day, Ex. J at 395.  However, Plaintiff provides no evidence to support this statement.  Defendants contend that Plaintiff worked at the Housing Department a couple of weeks before he took leave until January 15, 2003.  He then returned to work for thirteen days before finally resigning on February 7, 2003.  Defendants'

version is supported by an affidavit by Renetta Torres, the Human Resource Director as well as a

copy of Plaintiff's timesheet. Ex. B & attachments.  Without more information on the nature of

Plaintiff's job responsibilities at the Housing Department, I will assume that Plaintiff has met his

prima facie burden.

       2.   <u>Shifting Burden</u>

     Plaintiff alleges that Defendant Lucero sent him a certified letter "offering him a position

on the tenth floor."  Resp. at 10.  He further alleges that on the morning he was to show up for

work on the Tenth Floor, he received a call from Defendant Lucero who instructed him not report

to the Tenth Floor, but directed him to report to the Housing Department at 8:00 a.m. on

November 4, 2002.  These facts are largely consistent with those presented by Defendants, with

the exception that Lucero's letter did not "offer" Plaintiff a position, but rather instructed Plaintiff

to report to work at the County Manager's Office, and notified Plaintiff that he would be under

Lucero's direct supervision.  Plaintiff goes on to dispute facts which he claims are alleged by

Defendants but are not, in essence setting up  straw men in order to knock them down.  For

example, he states in a somewhat contorted manner:

> "[a]llegedly Commissioner Gallegos got information from Diane Valdez that it would not
> be a good idea for Plaintiff to work on the tenth floor where Cummins' office was located.
> Ms. Valdez denies speaking to Commissioner Gallegos regarding Plaintiff working on the
> tenth floor."

Resp. at 10.  Ms. Valdez is an full-time employee who worked in the County Clerk's office.  <u>See</u>

Ex. 23 (Valdez affidavit).  However, nowhere do Defendants mention Ms. Valdez concerning the

issue of Plaintiff's placement in the Housing Office.  Defendant Lucero stated that he received a

telephone call on November 4, 2002 (the morning Plaintiff was to report for work) from

Commissioner Steve Gallegos "in which he advised me that it would not be a good idea to place Mr. Cordova on the Tenth Floor."  Mr. Lucero subsequently made the decision to temporarily assign Plaintiff to the Housing Department "pending the outcome of the Sheriff's Department's investigation."  Ex. G, ¶ 9.

Plaintiff believes that keeping him from working at the County Manager's Office was a form of retaliation by Cummins, Vigil, Torres and Lucero.[8]  Yet he does not present any evidence that either Defendant Cummins, Vigil, or Torres had any part whatsoever in Plaintiff's job assignment, from the initial letter instructing Plaintiff to report to the Tenth Floor, to the final phone call instructing him to go to the Housing Office.  Nor does Plaintiff challenge the fact that Commissioner Gallegos called Defendant Lucero, or that it was Commissioner Gallegos (not a defendant in this case), not Defendant Cummins, Vigil, Torres or Lucero, who directed the change from assignment from the Tenth Floor to the Housing Department.  Having failed to rebut Defendant Lucero's non-discriminatory reasons for the decision to assign him at the Housing Department, Plaintiff cannot avoid summary judgment on this claim.

G.    Media Coverage

1.    Prima Facie Case

Plaintiff contends that Defendants discriminated against him by contacting the media about his involvement in the fraud scheme.  This could be considered an adverse employment action. An adverse employment action not limited to situations where a plaintiff can show loss of an actual job, but also as encompasses those acts that carry a "significant risk of humiliation, damage

---

[8]  Plaintiff also describes his assignment in the Housing Department as a form of discrimination, and is therefore addressed in that section of the discussion.  See, Response at 11.

to reputation, and a concomitant harm to *future employment prospect*s."  See, Hillig v. Rumsfeld, 381 F.3d 1028  (10th Cir. 2004) (emphasis supplied).

      2.    Shifting Burden

The problem with this claim is that Plaintiff presents no evidence to suggest that any of the individual Defendants actually spoke with the media.  Plaintiff concedes that Defendants did not admit contacting the media (a fact which is borne out by affidavits presented by Defendants in Exhibits B, ¶ 5; Ex. C,  ¶ 8; Ex. E, ¶ 10 and Ex. G, ¶ 3).  Through the testimony of Liz Hamm, the County's Public Information Defendants propose the possibility that the media could have obtained the information the search warrant itself once it became a public document.  Ex. S, 18:1-15.  Plaintiff states that the "media was aware and was present at Defendant's home during execution of the search warrants. . . " (Response, ¶ 12) but offers no evidence for that statement, which still does not demonstrate any proof that any of the Defendants contacted the media.  Plaintiff's only rebuttal to Defendants' legitimate explanation is that it is "common sense" to believe that Defendants contacted the media.  ¶ 12.  "Common sense" does not qualify as evidence.  Summary judgment will be granted to Defendants on this claim.

H.    Replacement by Suzanne Gutierrez

Plaintiff alleges this claim as an after-thought, since it was not alleged as a basis for recovery in either the complaint, or in Plaintiff's discovery responses.  The claim has no merit even if Plaintiff had timely raised it.  Plaintiff bases the claim on the fact that Ms. Gutierrez became the Manager of YSS after Plaintiff resigned on February 7, 2003.

Ms. Gutierrez' assignment to the Manager position cannot be considered an adverse employment action, since Plaintiff had resigned a full year *before* Ms. Gutierrez became Manager

in 2004. Deft's Ex. K, at 36:14-23.  Further, Defendants present legitimate and nondiscriminatory reasons for selecting Ms. Gutierrez for the job: Ms. Gutierrez worked as Plaintiff's assistant since August 1999, for three and one-half years, before Plaintiff resigned.  Plaintiff attempts to set up an inference of illegal motive by alleging that Defendant Cummins was a close personal friend of Ms. Gutierrez.  Defendant Cummins testified that he first met Ms. Gutierrez when she was Commissioner Rutherford's assistant, while Cummins was still serving on the City Council, and also testified that he has attended "a couple of [Guterriez' son's] birthday parties" which were not held at Gutierrez' house, but at the Paradise Hills swimming pool.  Ex. L at 55-57.   At best, Plaintiff raises an inference that Ms. Gutierrez' selection (one year after Plaintiff left the position himself) may have been influenced by her personal acquaintance with Defendant Cummins.  The problem is that Title VII  does not prohibit conduct based on personal acquaintance or favoritism, as discussed earlier.  Plaintiff cannot establish a pretextual basis for Defendants' actions in assigning Ms. Gutierrez to the post of YSS Manager.  Therefore, Defendants' are entitled to summary judgment on this claim also.

I.      <u>Title VII - Racial Hostile Environment</u>

Racial harassment, like sexual harassment, comes under Title VII's prohibition against sex discrimination.  <u>Harris v. Forklift Sys., Inc</u>, 510 U.S. 17 (1993).  Plaintiff's complaint is woefully sketchy as to the basis for his hostile environment claim.  <u>See</u>, Complaint, Count I.  It appears that Plaintiff bases his hostile environment claim on the following: (1) complaints and phone calls made by Commissioner Cummins about the YSS program; (2) the letter of reprimand Plaintiff

received on March 6, 2002,[9] (3) Plaintiff's treatment at the Housing Department.

To survive summary judgment, Plaintiff must show that under the totality of the circumstances : (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus. Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir.1994) (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986)).  For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."  Meritor, 477 U.S. at 67 (citation omitted); Smith v. Norwest Financial Acceptance, Inc.,129 F.3d 1408, 1412 (10th Cir. 1997).  Based on the totality of the circumstances, the environment must be perceived both subjectively and objectively as abusive. Harris, 510 U.S. at 21-23; Adler v. Wal-Mart Stores, Inc.,144 F.3d 664, 672 (10th Cir. 1998). In other words, the environment must be one that a reasonable person in the plaintiff's position would find hostile or abusive, and one that the victim did in fact perceive to be so.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

Plaintiff's hostile environment claim is flawed in that he cannot establish that the alleged harassment at the Housing Department was motived by racial animus, or that they were severe or pervasive in nature.  Plaintiff describes his working conditions at the Housing Department by the following:  the staff were not "mean," but did not know where he was supposed to be, or "what

---

[9]  Plaintiff is not barred from including unexhausted discrete claims of discrimination or retaliation under his hostile environment theory.  A plaintiff can include acts of hostile work environment outside of the 300-day limitation period, even if plaintiff should have known at earlier time that she was being discriminated against.  See, Boyer v. Cordant Technologies, Inc. et al., 316 F.3d 1137 (10th Cir. 2003) (relying on Nat'l RR Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)).

to do" with him (Ex. J, 396:22-25; 400:1-8); he did not like how he was "getting looked at" (Ex. 411:19-23), nobody used derogatory racial slurs (Ex. A,202:24-25); for the first two days, the Plaintiff did not have a work station, so he left the site on both days (Ex. J, 398:1-3).  On the third day, Plaintiff was given a desk with no supplies or pencils, and the desk was set "amongst the clerical staff" (Ex. J, 398:1-13); on the same day, he was given a book on inspections and asked to read it (Ex. J, 398:7-13; ); he was given training only for one day even though Plaintiff had no experience with housing inspections (Ex. J, 400:13-16; 399:22-24); it took Plaintiff 15 to 20 minutes longer to travel to work to get to the Housing Department than to the YSS site (Ex. J, 413:23-25); Plaintiff was on a sign in/sign out basis and was given a half-hour lunch (Ex. J, 412:21-22); he was required to use his own vehicle to do housing inspections, as opposed to using a County vehicle which he had at the YSS job (Ex. J, 414:7-9).

Plaintiff's claim lacks the required showing of severity or pervasiveness, even when considering his allegations cumulatively.  Plaintiff's experiences at the Housing Department may have occurred as a result of confusion or lack of preparation, since it is undisputed that Plaintiff's assignment to the Housing Department was last-minute.  Plaintiff himself stated that he simply left work on the first two days when he found himself without a desk or supplies, even though he continued to be paid.  Some of the inconveniences Plaintiff experienced initially, such as lack of office space or supplies, were rectified shortly after he started. Plaintiff worked at the Housing Department only a few weeks before he resigned, and he does not dispute Defendants' contention that the assignment was meant to be temporary, pending the completion of the Sheriff's Department investigation. See, Ex. Q, ¶ 4, 7; Ex. J, 396 (asking "how long is this investigation supposed to go on without letting me have my job back?. . .").  At any rate, there is no evidence

31

that any of his treatment was racially hostile.  Plaintiff stated that no one ever used racially

derogatory words in the short while he was at the Housing Department.

A reasonable fact-finder would not find Plaintiff's situation at the Housing Department to

be either severe or pervasive, even when those allegations are viewed collectively to include those

related to his discrimination claims: Plaintiff's allegations concerning the March 2002 reprimand,

the hiring of John Cummins and Suzanne Gutierrez (see, Ex. 1, 181:10-15 - characterizing the

Commissioner's inquiry regarding his son's job at DEES, and Cindy Rivera's would-be promotion

as "harassment"), Cindy Rivera's promotion and the few phone calls and complaints made by

Defendant Cummins.  Also, as discussed earlier, Plaintiff failed to show any illegal motive or

pretext either in being disciplined in March of 2002 or in the phone calls and complaints the

Commissioner allegedly made concerning the DEES Summer Program.

I find that Plaintiff's allegations do not rise to the level of severe or pervasive, and do not pass

muster under the standard requiring a showing of racial animus.   Therefore, Defendants are

entitled to summary judgment on Plaintiff's hostile environment claims.

A.    Constructive Discharge

As part of his hostile environment claim, Plaintiff claims that he was constructively

discharged from his job when he submitted his resignation on February 7, 2003.  Constructive

discharge in the context of hostile environment requires something more than abusive working

environment.  The working conditions must be so intolerable that a reasonable person would feel

forced to resign. Pennsylvania State Police v. Suders, 124 S. Ct. 2342, 2351  (2004); Sprague v.

Thorn Americas, Inc., 129 F.3d 1355, 1367 (10th Cir. 1997); Yearous v. Niobrara County Mem'l

Hosp., 128 F.3d 1351, 1357 (10th Cir. 1997) (working conditions must be so severe that the

plaintiff simply had no choice but to quit); Tran v. Trustees of State Colleges in Colorado, 355 F.3d 1263, 1271 (10th Cir. 2004) (retaliation claim) (working conditions imposed by the employer are not only tangible or adverse, but intolerable). A plaintiff who voluntarily resigns cannot claim that he was constructively discharged. "The question is not whether working conditions at the facility were difficult or unpleasant." Yearous, 128 F.3d at 1357. Rather, Plaintiff must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship. Id., (citing Exum vs. United States Olympic Committee, 389 F.3d 1130 (10th Cir. 2004)).

The voluntariness of an employee's resignation is judged under an objective standard, from the perspective of a reasonable employee. Exum, 389 F.3d 1130. Given the reason for Plaintiff's placement outside of his former position at YSS (the fraud investigation), Plaintiff's discomfort and embarrassment is understandable. However, I find that a reasonable person would not have considered it to be intolerable to the point of being forced to quit. See, Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003) ("It is not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world"). Plaintiff continued to receive the same salary and benefits at the Housing Department as he did at his former position as Manager of the YSS section at DEES. He understood that the assignment there was to be temporary. Some of the initial inconveniences were ironed out within a few days, and despite Plaintiff's lack of qualifications and training for doing house inspections, he soon became reasonably proficient at his new duties. Ex. J, 395:20-22 ("I finally learned how to do inspections"). Nevertheless, Plaintiff worked at the Housing Department for only a short time, and resigned before the Sheriff's Department completed its investigation. Ex. Q, ¶ 5. Thus, I find

33

that no reasonable fact finder would conclude that Plaintiff was forced to quit, and further, that

Plaintiff has not shown that Defendants denied him the opportunity to make a "free choice

regarding his employment relationship." Yearous, 128 F.3d at 1357.

In sum, I find that Plaintiff has not presented any evidence which would create an issue of

fact on any of his discrimination and hostile environment claims. See, Martin v. Nannie and the

Newborns, Inc., 3 F.3d 1410, 1414 (10th Cir. 1993); Carey v. United States Postal Service, 812

F.2d 621 (10th Cir. 1987). Therefore, summary judgment will be granted on all those claims.

## II.      Retaliation under Title VII - Count II

Plaintiff claims that the March 2002 letter of reprimand and the harassing activities of

Defendants constitutes retaliation. To make out a prima facie case of retaliation, Plaintiff must

show that (1) he engaged in protected opposition to discrimination or participation in a Title VII

proceeding; (2) he suffered an adverse employment action; and (3) there is a causal connection

between the protected activity and the adverse employment action. O'Neal v. Ferguson Constr.

Co., 237 F.3d 1248, 1252 (10th Cir. 2001).

A.      Protected Activity

Plaintiff's retaliation claims fails at the outset because he fails to establish that he was

engaged in protected activity. His EEOC complaint was not filed until *after* he resigned, and so

cannot form the basis for his retaliation claim. See, Anderson v. Coors Brewing Co.,181 F.3d

1171, 1179 n.2 (10th Cir. 1999) (adverse action must occur after protected activity, not before).

Plaintiff never complained to anyone who was in a supervisory capacity that he was being treated

differently because he was Hispanic. Ex. 1, 184:1-8. As discussed above, Plaintiff's objections to

his letter of reprimand, presented in his grievance letter, were not couched in terms of

discrimination or retaliation.  Ex. 3, 63:25 - 64:1-5.  <u>Jurado v. Eleven-Fifty Corp.</u>, 813 F.2d 1406,

1411-12 (9th Cir. 1987) (Hispanic disc jockey failed to demonstrate that radio station was aware

that his opposition to radio station's English-only requirement was for reasons of race rather than

for personal reasons that his ratings may suffer).

Defendants point out that by Plaintiff's own admission, he did not form the belief that he

was being discriminated against until after the conversations he had with Defendant Cummins.

Ex. A, 200:12-19.  As indicated in his EEOC charge, Plaintiff contends that he suffered retaliation

because he opposed discriminatory requests to hire and promote employees -- which based on

Plaintiff's allegations, refers to the requests to hire and promote concerning Ms. Gutierrez, John

Cummins and Ms. Rivera.  However, at no time did Plaintiff voice any opposition to the requests,

much less opposition based on a perception of racial discrimination.  <u>See</u>, Ex. A, 66:4-17; 101:5-

13.  Also, the letter of reprimand appears to predate any of the Plaintiff's alleged "opposition" to

the hiring and promotion requests.  Having failed to show that he engaged in protected activity,

Plaintiff's retaliation claim fails here, but in an abundance of caution, the Court proceeds with the

remainder of the inquiry.

B.      <u>Adverse Action</u>

Plaintiff attempts to base his retaliation claims on the same conduct on which he bases

claims of hostile work environment.  <u>Cmp.</u>, <u>Ford v. West</u>, 222 F.3d 767, n.6 (10th Cir. 2000)

(noting that plaintiff conceded that claims of hostile work environment and retaliation may be

analyzed under a single hostile work environment theory).  The Court has already determined that

Plaintiff may have suffered adverse employment actions on the basis of the March 2002 letter of

reprimand, the filing of the police report and Plaintiff's assignment to the Housing Department.

C.    Causal Connection

Plaintiff can establish a causal connection by presenting "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1320 (10th Cir.1999) (quoting Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir.1982)).  However, Plaintiff's retaliation claim suffers the same defect, and therefore the same fate, as his discrimination claims in that he offers no evidence which creates an issue of fact concerning whether any of the Defendants had a retaliatory motive in carrying out any of the alleged adverse actions.  Plaintiff never told any of the Defendants that he felt singled out by the March 2002 reprimand because he was Hispanic.  He never indicated to any of the Defendants that he felt the phone calls and complaints from the Commissioner, or the requests to hire and promote Ms. Gutierrez, John Cummins and Cindy Rivera were discriminatory.  In the seven letters Plaintiff generated to Defendants from the time he was placed on administrative leave with pay until he resigned on February 7, 2003, Plaintiff never mentioned that he believed he was the victim of retaliation.  Ex. A, 258:9-22.  See, Petersen v. Utah Dep't of Corrections, 301 F.3d 1182, 1188 (10th Cir. 2002) (no retaliation where retaliatory supervisor was unaware that employee engaged in protected opposition, in that employee complained about defendant's treatment of co-employee, but complaints made were only about general unfair treatment and not discriminatory motives).

In the end, Plaintiff's claims are forged out of sheer speculation, because he "[doesn't] have any other answers to what happened to [him]."  Ex. A, 204:17-24.  Mere conjecture that Defendants acted with discriminatory reasons will not suffice to establish pretext. Annett vs.

36

University of Kansas, 371 F.3d 1233 (10th Cir. 2004).  Accordingly, Plaintiff's retaliation claim

will be dismissed on summary judgment.

**III.**     **Section 1981 claims**

Defendants' brief includes arguments opposing Plaintiff's claims asserted under 42 U.S.C.

§ 1981.  Section 1981 prohibits racial discrimination in "the making, performance, modification,

and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of

the contractual relationship." 42 U.S.C. § 1981(a) and (b).  To make a claim under section 1981,

Plaintiffs must show that Defendants intentionally or purposefully discriminated against them.

General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982); Reynolds v.

School Dist. No. 1, Denver, Colorado, 6 F.3d 1523, 1532 (10th Cir. 1995).  However, I have not

found where the Plaintiff alleges claims under § 1981, either in the Pretrial Order (Doc. 55 at 6-

7), the Complaint or Plaintiff's response brief to Defendants' motion for summary judgment.[10]

However, if Defendants are construing Plaintiff's claims liberally to include a theory of

recovery under § 1981, they are also correct in their assessment that those claims must be

dismissed, since they are based on the identical facts and conduct which form the basis for the

claims asserted under Title VI.  Without an independent basis to support them, any claims brought

under § 1981must be dismissed. See, Roberts v. Roadway,149 F.3d 1098, 1103 (10th Cir.1998;

cmp., Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir.2000) (findings on claims

---

[10]  In the Pretrial Order, filed a few weeks before trial, Plaintiff also identifies 42 U.S.C. §
1983 and the New Mexico Tort Claims Act as applicable to this case.  Plaintiff's Tort Claims Act
claims were dismissed previously by the Court on Defendants' motion (Docs. 12, 23).
Defendants rightly object to Plaintiff's late addition of a § 1983 claim.  Plaintiff does not assert
such a claim in his complaint, nor has Plaintiff ever sought leave of Court to amend the complaint
to add this claim.  Therefore, this claim will not be considered.

brought under § 1981 is normally conclusive on the issue of liability in a parallel action under Title VII).

Unlike Title VII claims, claims brought under § 1983 can be asserted against individual defendants.  Defendants have asserted the defense of qualified immunity on Plaintiff's § 1981 claims.[11]  See, Patrick v. Miller, 953 F.2d 1240, 1249-50 (10th Cir. 1992) (applying qualified immunity defense to § 1981 claim). Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Under the two-part test for evaluating qualified immunity, the plaintiff must show (1) that the defendant's conduct violated a constitutional or statutory right, and (2) that the law governing the conduct was clearly established at the time of the alleged violation.  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255 (10th Cir. 1998). Unless both prongs are satisfied, the defendant will not be required to "engage in expensive and time consuming preparation to defend the suit on its merits." Siegert v. Gilley, 500 U.S. 226, 232 (1991).

Like Title VII, § 1981 requires a showing of discriminatory intent.  Because I have consistently found a lack of showing of discriminatory intent in Plaintiff's Title VII in any of his allegations, Plaintiff's § 1981 claims also fail to allege a violation of a constitutional right. Without this showing, there is no need to proceed further on the qualified immunity inquiry. See, Saucier v. Katz, 533 U.S. 194, 201 (2001) (If no constitutional right would have been violated

---

[11]  Title VII claims brought against any Defendant in his individual capacity were dismissed earlier because personal capacity suits are inappropriate under that theory.  See, discussion, above.

were the allegations established, there is no necessity for further inquiries concerning qualified immunity).

## Conclusion

Plaintiff's various assertions of discrimination brought under Title VII fail either because Plaintiff did not suffer adverse employment actions, or because Plaintiff failed to present evidence to create a dispute of fact regarding whether Defendants' legitimate nondiscriminating reasons were pretextual.  Further, Plaintiff's claim of disparate discipline is subject to dismissal based on failure to administratively exhaust. As discussed above, Plaintiff's Title VII retaliation claim fails because he did not demonstrate that he had engaged in protected activity, and also because he again fails to show evidence from which a reasonable fact finder can infer pretext.  Any claims asserted by Plaintiff under § 1981 follow in the wake of his Title VII claims, and are dismissed for failure to show any evidence of discriminatory intent on the part of Defendants.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (**Doc. 43**) is hereby GRANTED for reasons described above, thereby DISMISSING this action IN ITS ENTIRETY;

**IT IS FURTHER ORDERED** that, given the disposition of Plaintiff's claims, Defendants' Motion for Leave to File Second Motion for Summary Judgment Outside Deadline for Dispositive Motions (**Doc. 56**) and Defendants' Unopposed Motion to Vacate Trial Setting and Other Pretrial Deadlines (**Doc. 59**) are hereby DENIED AS MOOT.

_____
UNITED STATES DISTRICT JUDGE